1  BENJAMIN C. MIZER
   Principal Deputy Assistant Attorney General
2  ELIZABETH J. SHAPIRO
   Deputy Director
3  ERIC B. BECKENHAUER (Cal. Bar No. 237526)
   Trial Attorney
4  U.S. Department of Justice
   Civil Division, Federal Programs Branch
5  20 Massachusetts Ave. NW
   Washington, DC  20530
6  Tel: (202) 514-3338
   Fax: (202) 616-8470
7  Email: eric.beckenhauer@usdoj.gov

8  *Attorneys for Defendant*

9              **IN THE UNITED STATES DISTRICT COURT**

10              **FOR THE DISTRICT OF ARIZONA**

11

12  American Civil Liberties Union          No. CV-14-2052-TUC-RM-BPV
    Foundation of Arizona, *et al.*,
                                            **LODGED: PROPOSED**
13                        Plaintiffs,       **DEFENDANT'S MOTION FOR**
                                            **SUMMARY JUDGMENT**
14  v.

15  U.S. Department of Homeland Security,

16                        Defendant.

17

18      Defendant, the United States Department of Homeland Security ("DHS"), hereby

19  moves for summary judgment on all causes of action alleged in the complaint.  See Fed.

20  R. Civ. P. 56.  This motion is supported by the accompanying memorandum of law and

21  the attached declarations and Vaughn indexes of:

22      • Shari Suzuki, U.S. Customs and Border Protection (Ex. A)

23      • Aneet Marwaha, DHS's Office of the Inspector General (Ex. B)

24      • Kevin Tyrrell, DHS's Office for Civil Rights and Civil Liberties (Ex. C)

25      • Fernando Pineiro, U.S. Immigration and Customs Enforcement (Ex. D)

26      • David M. Hardy, Federal Bureau of Investigation (Ex. E)

27      • John W. Kornmeier, Executive Office for United States Attorneys (Ex. F)

28

1  BENJAMIN C. MIZER
   Principal Deputy Assistant Attorney General
2  ELIZABETH J. SHAPIRO
   Deputy Director
3  ERIC B. BECKENHAUER (Cal. Bar No. 237526)
   Trial Attorney
4  U.S. Department of Justice
   Civil Division, Federal Programs Branch
5  20 Massachusetts Ave. NW
   Washington, DC 20530
6  Tel: (202) 514-3338
   Fax: (202) 616-8470
7  Email: eric.beckenhauer@usdoj.gov

8  *Attorneys for Defendant*

9              **IN THE UNITED STATES DISTRICT COURT**

10            **FOR THE DISTRICT OF ARIZONA**

11

12  American Civil Liberties Union          No. CV-14-2052-TUC-RM-BPV
    Foundation of Arizona, *et al.*,
                                            **DEFENDANT'S MOTION FOR**
13                          Plaintiffs,     **SUMMARY JUDGMENT**

14  v.

15  U.S. Department of Homeland Security,

16                          Defendant.

17

18        Defendant, the United States Department of Homeland Security ("DHS"), hereby

19  moves for summary judgment on all causes of action alleged in the complaint. <u>See</u> Fed.

20  R. Civ. P. 56.  This motion is supported by the accompanying memorandum of law and

21  the attached declarations and <u>Vaughn</u> indexes of:

22      • Shari Suzuki, U.S. Customs and Border Protection (Ex. A)

23      • Aneet Marwaha, DHS's Office of the Inspector General (Ex. B)

24      • Kevin Tyrrell, DHS's Office for Civil Rights and Civil Liberties (Ex. C)

25      • Fernando Pineiro, U.S. Immigration and Customs Enforcement (Ex. D)

26      • David M. Hardy, Federal Bureau of Investigation (Ex. E)

27      • John W. Kornmeier, Executive Office for United States Attorneys (Ex. F)

28

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................1

    A.    The Department of Homeland Security .................................................1

    B.    Plaintiffs' FOIA Requests .....................................................................2

    C.    Defendant's Response to Plaintiffs' FOIA Requests ................................4

ARGUMENT ...................................................................................................................5

I.     LEGAL STANDARD IN FOIA CASES ................................................................5

II.    DHS CONDUCTED A REASONABLE SEARCH ..................................................6

III.   DHS PROPERLY WITHHELD RECORDS EXEMPT FROM DISCLOSURE ...................10

    A.    DHS properly withheld records under Exemption 2—agency personnel rules and practices ....................................................11

    B.    DHS properly withheld records under Exemption 3—information exempted from disclosure by statute ........................................12

    C.    DHS properly withheld records under Exemption 4—confidential commercial information ...........................................................13

    D.    DHS properly withheld records under Exemption 5—privileged information ...........................................................................15

    E.    DHS properly withheld records under Exemptions 6 and 7(C)—personal privacy ............................................................19

    F.    DHS properly withheld records under Exemption 7(D)—confidential sources .................................................................21

    G.    DHS properly withheld records under Exemption 7(E)—law enforcement techniques, procedures, and guidelines ...............22

    H.    DHS properly withheld records under Exemption 7(F)—risk to life or physical safety ..........................................................26

IV.   REASONABLY SEGREGABLE PORTIONS OF RECORDS HAVE BEEN RELEASED ....27

V.    PLAINTIFFS' REMAINING CLAIMS ARE MOOT ...................................................28

CONCLUSION ...............................................................................................................29

**INTRODUCTION**

This case concerns the Department of Homeland Security's response to a pair of

Freedom of Information Act ("FOIA") requests seeking "all" records concerning U.S.

Border Patrol "checkpoint operations" and "roving patrol operations" in southern

Arizona. Defendant is entitled to summary judgment because it has fully complied with

its obligations under FOIA. Defendant conducted a reasonable search for records

responsive to Plaintiffs' FOIA requests, and released more than 13,000 pages of records

to Plaintiffs. Moreover, Defendant properly redacted information from the released

records, and withheld other records in full, under FOIA exemptions 2, 3, 4, 5, 6, 7(C),

7(D), 7(E), and 7(F). Defendant's motion for summary judgment should therefore be

granted.

**BACKGROUND**

**A.    The Department of Homeland Security**

The Department of Homeland Security ("DHS") is responsible for securing the

nation's borders and enforcing its immigration laws. Those duties are divided among

several DHS components, including U.S. Customs and Border Protection ("CBP").

Within CBP, the Office of Field Operations enforces immigration laws at ports of entry,

such as international airports and official land crossings. Another CBP division, the U.S.

Border Patrol—the focus of Plaintiffs' FOIA requests—secures the border against

unlawful entry between ports of entry. (A separate DHS component, U.S. Immigration

and Customs Enforcement, enforces immigration laws in the interior of the country.)

To accomplish its mission, the Border Patrol has established three main lines of

defense. See GAO, Report 09-824, at 6 (2009), available at http://www.gao.gov/assets/

300/294548.pdf (hereinafter "GAO"). First, agents are assigned to "line watch"

operations at the border, where they turn back or arrest persons attempting to cross the

border unlawfully. Id. Second, agents at traffic checkpoints, usually located on major

highways and secondary roads up to 100 miles inland, see 8 C.F.R. § 287.1(a), intercept

individuals who evade detection at the border and prevent them from reaching major

population centers.  GAO at 6.  Third, "roving patrols" apprehend persons who attempt to circumvent these border defenses.  See id.

**B.      Plaintiffs' FOIA Requests**

In January 2014, Plaintiffs—the ACLU Foundation of Arizona, Derek Bambauer, and Jane Bambauer—submitted a pair of FOIA requests to DHS.  Those requests sought the disclosure of "all" records regarding two of the Border Patrol's three main lines of defense.  The first request sought "all" records related to Border Patrol "checkpoint operations," including "at least" the following:

> 1.) All records relating to Border Patrol tactical and permanent vehicle checkpoint operations in Tucson and Yuma Sectors from January 2011 to present, including but not limited to:
>
>> a. Internal memoranda, legal opinions, guidance, directives, criteria, standards, rules, instructions, advisories, training materials, and any other written policies or procedures pertaining to checkpoint operations in Tucson and Yuma sectors, including but not limited to:
>>
>>> 1. All documents related to application of U.S. law and agency guidelines at Border Patrol checkpoints, including but not limited to any legal limitations, or lack thereof, regarding checkpoint placement or location, and policies and procedures regarding questioning and detaining vehicle occupants, searching or entering the interior of vehicles, responding to motorists' refusals to answer questions and/or consent to vehicle searches; and responding to motorists' use of video and/or audio recording devices at checkpoints;
>>>
>>> 2. All documents related to service canines, including all information related to training, certification, qualifications, and performance of service canines and service canine handlers, and any policies or procedures related to canines that falsely alert to the presence of contraband or concealed persons; and
>>>
>>> 3. All documents related to citizen complaint procedures at checkpoints;
>>
>> b. Communications, agreements, or any other records related to collaboration or cooperation with, or the presence of, local law enforcement entities at checkpoints, including state and local police and sheriffs' departments;
>>
>> c. Audits, reports, statistical data and analysis, quotas, targets, goals, and performance standards, measures, or reviews, and all documents related to any incentives or bonus programs relating to checkpoint operations in Tucson and Yuma sectors;

d. Inventories and records pertaining to all surveillance and inspection technologies and equipment, including non-intrusive inspection technologies, such as a VACIS or backscatter X-ray machines, in use at each tactical and permanent checkpoint in Tucson and Yuma sectors;

e. Organizational charts, diagrams, or schematics, including records sufficient to show:

1. The number and geographic location of all permanent and tactical Border Patrol vehicle checkpoints in Tucson and Yuma sectors;

2. The total monthly hours of operation of each permanent and tactical Border Patrol vehicle checkpoints, by month, in Tucson and Yuma sectors; and

3. Any plans, designs, studies, or diagrams for any additional vehicle checkpoints not currently in operation in Tucson and Yuma sectors;

f. Records regarding any individual stopped, searched, detained, and/or arrested at Border Patrol checkpoints in Tucson and Yuma sectors, including but not limited to:

1. Forms I-247;
2. Forms I-213;
3. Forms I-286;
4. Forms I-44;
5. Forms I-862;
6. Forms I-826; and
7. Forms I-210.

g. Records – in particular, but not limited to, all documents listed in Request 1.f above – relating to the following specific topics and/or containing information sufficient to show:

1. The total number of arrests at each checkpoint, by month, for each of the years 2011, 2012, and 2013;

2. The total number of U.S. citizens arrested at each checkpoint, by month, for each of the years 2011, 2012, and 2013;

3. The total number of undocumented individuals arrested at each checkpoint, by month, for each of the years 2011, 2012, and 2013;

4. The basis for each checkpoint arrest, by month, for each of the years 2011, 2012, and 2013, including information recorded in Forms I-247, I-213, I-286, I-44, I-862, I-826, and I-210;

5. The basis for each checkpoint vehicle search resulting in arrest, by month, for each of the years 2011, 2012, and 2013, including information recorded in Forms I-247, I-213, I-286, I-44, I-862, I-826, and I-210;

6. The total number of alerts by service canines that resulted in the discovery of contraband or concealed persons, by month, for each of

the years 2011, 2012, and 2013, including information recorded in Forms I-247, I-213, I-286, I-44, I-862, I-826, and I-210;

7. The total number of alerts by service canines that did not result in the discovery of contraband or concealed persons, by month, for each of the years 2011, 2012, and 2013, including information recorded in Forms I-247, I-213, I-286, I-44, I-862, I-826, and I-210;

8. All property seized at each checkpoint, the date seized, a description of the property seized, and the basis for the seizure, by month, for each of the years 2011, 2012, and 2013; and

9. The names and badge numbers of the agent(s) involved in reviewing each arrest to determine whether reasonable suspicion or probable cause existed to justify each stop, and whether the reviewing agent(s) were the same as those who made the stop under review, by month, for each of the years 2011, 2012, and 2013;

h. All complaints related to Border Patrol checkpoint operations in Tucson and Yuma sectors received by any Border Patrol, CBP, or DHS official from any person, organization, agency, tribal government, consular office, or any other entity, whether verbal or written, and all documents related or responding to any such complaints; and

i. All disciplinary records resulting from agent misconduct or alleged violation of Border Patrol, CBP, and/or DHS rules and regulations related to checkpoint operations in Tucson and Yuma sectors.

2.) Records sufficient to show the maximum number and geographic location of all U.S. Border Patrol checkpoints – permanent and tactical – in operation nationwide during each of the years 1976 to the present.

Compl. Ex. A at 4-6. Plaintiffs' second request—the text of which is omitted for brevity—sought "all" records related to Border Patrol "roving patrol operations," and included a similarly long list of subparagraphs. Compl. Ex. B. at 5-7.

**C.    Defendant's Response to Plaintiffs' FOIA Requests**

After initially receiving no response to their FOIA requests or administrative appeals, Plaintiffs filed this action. See Compl. ¶ 2. Defendant timely answered the complaint in July 2014, and the case was stayed from August 2014 to September 2015 to facilitate settlement discussions. See ECF Nos. 16, 18, 20, 22, 24. During that time, DHS provided Plaintiffs with details about its search for responsive records, agreed to conduct additional searches, and produced records to Plaintiffs on a rolling basis. See, e.g., ECF No. 15 ¶ 2.

In September 2015, the parties reported that their settlement discussions had reached an impasse, and they jointly proposed a briefing schedule.  Since that time, in an effort to narrow the issues in dispute, Defendant continued to conduct further searches, see ECF No. 34 ¶ 4, and continued to produce records on a rolling basis.  Some of those searches located potentially responsive records that were created by other agencies, including the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Agency ("DEA"), and the Executive Office for United States Attorneys ("EOUSA").  Accordingly, Defendant forwarded some of those records to those agencies for processing, as permitted by DHS regulations.  6 C.F.R. § 5.4(c)(2).

All told, in response to Plaintiffs' FOIA requests, Defendant ultimately produced more than 13,000 pages of records in full or in part.  Defendant's response to Plaintiffs' requests is now complete, and it should be granted summary judgment for the reasons set forth below.

## ARGUMENT

### I.  LEGAL STANDARD IN FOIA CASES

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Because facts in FOIA cases are rarely in dispute, most such cases are decided on motions for summary judgment."  Yonemoto v. Dep't of Veterans Affairs, 686 F.3d 681, 688 (9th Cir. 2012); see also Lawyers' Comm. for Civil Rights v. U.S. Dep't of Treasury, 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008) ("As a general rule, all FOIA determinations should be resolved on summary judgment.").  To prevail, the "defendant in a FOIA case must show [1] that its search for responsive documents was adequate, [2] that any exemptions claimed actually apply, and [3] that any reasonably segregable nonexempt parts of records have been disclosed after redaction of exempt information."  Light v. DOJ, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

## II.    DHS CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS

On summary judgment in a FOIA case, the agency must demonstrate that "it has conducted a search reasonably calculated to uncover all relevant documents." <u>Lahr v. Nat'l Transp. Safety Bd.</u>, 569 F.3d 964, 986 (9th Cir. 2009) (internal quotation marks omitted). "This showing may be made by reasonably detailed, nonconclusory affidavits submitted in good faith." <u>Id.</u> (quotation marks omitted). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." <u>Lawyers' Comm.</u>, 534 F. Supp. 2d at 1131. While those affidavits should be "sufficiently detailed," the agency "'need not set forth with meticulous documentation the details of an epic search for the requested records.'" <u>Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State</u>, 818 F. Supp. 1291, 1294-95 (N.D. Cal. 1992) (quoting <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982)).

In weighing the adequacy of a search, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the <u>search</u> for those documents was <u>adequate</u>." <u>Citizens Comm'n on Human Rights v. FDA</u>, 45 F.3d 1325, 1328 (9th Cir. 1995) (citation and quotation marks omitted). The sufficiency of a search is generally determined by the "appropriateness of the methods" used to carry it out, "not by the fruits of the search." <u>Iturralde v. Comptroller of the Currency</u>, 315 F.3d 311, 315 (D.C. Cir. 2003). Accordingly, the failure of an agency "to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records." <u>Wilbur v. CIA</u>, 355 F.3d 675, 678 (D.C. Cir. 2004).

As explained in the accompanying declarations, Defendant's search meets this standard. Indeed, Defendant conducted searches within four separate DHS components—(1) U.S. Customs and Border Protection; (2) DHS's Office of the Inspector General; (3) DHS's Office for Civil Rights and Civil Liberties; and (4) U.S. Immigration

and Customs Enforcement—including multiple offices within several of those components.

## A. U.S. Customs and Border Protection

U.S. Customs and Border Protection ("CBP")—the Border Patrol's parent agency—determined that five offices were the most likely and only reasonable sources of responsive records, and directed each to conduct a search: (a) the U.S. Border Patrol; (b) the Office of the Commissioner; (c) the Office of Public Affairs; (d) the Office of Internal Affairs; and (e) the Office of Human Resources Management. Suzuki Decl. ¶ 14.

First, the Border Patrol conducted a search of both its headquarters in Washington, DC, and its field offices in the Tucson and Yuma sectors. At Border Patrol headquarters, a keyword search of the internal shared drive using the keywords "checkpoint" and "roving patrol" was performed. Id. ¶ 17. (For all electronic searches, a search for the singular form of a word would also retrieve the plural when the roots are the same. Id.) In Tucson sector, the sector headquarters and all eight stations (Ajo, Brian A. Terry, Casa Grande, Douglas, Nogales, Sonoita, Tucson, and Willcox) were directed to conduct a search of relevant paper and electronic files using the keywords "checkpoint" and "roving patrol." Id. ¶ 25. Likewise, in Yuma sector, the sector headquarters and all three stations (Blythe, Yuma, and Wellton) were directed to conduct an electronic search of their shared drives for the terms "checkpoint" and "roving patrol." Id. ¶ 26. Further, CBP's Office of Information Technology conducted a centralized search of the email files of every Chief Patrol agent who oversaw either the Tucson or Yuma sector between 2011 and 2014 for records containing either "checkpoint" or "roving patrol" and any of the words "policy," "guidance," "procedure," or "protocol." Id. ¶ 30-31. In addition, at the suggestion of the Tucson and Yuma sectors, the Office of the Border Patrol Canine Program conducted an electronic search of its shared drives for documents related to the use of canines during checkpoint operations. Id. ¶ 27.

In addition, the Border Patrol determined that querying the Enforcement Integrated Database ("EID") was the most reasonable way to locate, to the extent

7

possible, the information that Plaintiffs sought regarding apprehensions, canine alerts, and property seizures at checkpoints. Id. ¶ 13. After extracting this data, the Border Patrol created a series of spreadsheets reflecting the numbers of (a) deportable subjects; (b) nondeportable subjects; (c) property seizures; and (d) canine-assisted property seizures, at each checkpoint, by month, from 2011 to 2013. Id. ¶ 19-21. Likewise, to locate records regarding individuals "stopped, questioned, searched, detained, and/or arrested" at checkpoints, Compl. Ex. A ¶ 1(f), the Border Patrol queried EID for encounters that resulted either in the generation of a Form I-213 ("Record of Deportable/Inadmissible Alien") or a Form I-44 ("Report of Apprehension or Seizure") and extracted those forms. Suzuki Decl. ¶ 22-23.

Second, within the Office of the Commissioner, the Executive Secretariat performed an electronic search of the Commissioner's correspondence database for the keywords "checkpoint," "roving patrol," and "automobile stop," id. ¶ 33, and the Office of the Nongovernmental Organizational Liaison searched its email records for the terms "checkpoint" and "roving patrol," id. ¶ 32. In addition, the Commissioner's Situation Room conducted an electronic search for Significant Incident Reports containing the terms "checkpoint" or "roving patrol" that were responsive to the requests. Id. ¶ 34.

Third, the Office of Public Affairs performed a manual search of the CBP Info Center, its web-based system for complaints and other feedback, for complaints responsive to Plaintiffs' requests. Id. ¶ 35. Fourth, the Office of Internal Affairs, which investigates complaints of employee misconduct, searched its case tracking system, the Joint Intake Case Management System, for the keywords "roving patrol," "checkpoint operations," "vehicle stop," "warrantless stop," "warrantless seizure," "questionable inspection," "unauthorized search," "forcibly removed," "without consent," and "traffic stop." Id. ¶ 36. Fifth, the Office of Human Resource Management's Division of Labor and Employee Relations, which maintains employee discipline records, retrieved any disciplinary records related to the complaints that Internal Affairs had identified as

responsive, id. ¶ 38, and also searched its own case tracking system for the terms "checkpoint," "checkpoints," and "roving," id. ¶ 39.

**B.      DHS's Office of the Inspector General**

DHS's Office of the Inspector General ("OIG"), which conducts independent investigations and audits of DHS personnel and programs, searched three offices. First, the Office of Inspections conducted an electronic search of relevant folders on its shared network drive for the keywords "checkpoints," "checkpoint operations," "roving patrols," "incentives," "bonus," "Tucson," and "Yuma," but located no responsive records. Marwaha Decl. ¶ 6. Second, in the Office of Audits, division directors reviewed the requests but concluded that no relevant audits had been conducted. Id. ¶ 7. Third, the Office of Integrity and Quality Oversight, which investigates employee misconduct allegations, performed an electronic search of its case tracking system—for the keywords "vehicle checkpoint," "checkpoint," "roving border patrol," "roving," or "roving patrol"—to locate complaints alleging wrongdoing by Border Patrol agents. Id. ¶¶ 8, 13. For each, OIG released the case summary report from its database, as is its usual practice in FOIA cases. Id. ¶ 10. Further, for the subset of those complaints that it had investigated, OIG released the report of investigation and other investigative records uploaded into its case tracking system, including emails, and related records retrieved from Office of Investigations field offices. Id. ¶ 11.

**C.      DHS's Office for Civil Rights and Civil Liberties**

DHS's Office for Civil Rights and Civil Liberties ("CRCL") determined that its Compliance Branch, which investigates complaints alleging violations of civil rights and civil liberties in DHS activities, was the only branch likely to have responsive records. Tyrrell Decl. ¶ 9. CRCL directed that office to search its paper, electronic, and email files for the following search terms and operators: "vehicle AND checkpoint AND Tucson OR Yuma," "checkpoint AND Tucson OR Yuma," "roving AND Tucson OR Yuma," and "patrol AND Tucson OR Yuma." Id. ¶ 10.

**D.     U.S. Immigration and Customs Enforcement**

U.S. Immigration and Customs Enforcement ("ICE") determined that the only office potentially likely to have responsive records was its Office of Professional Responsibility ("OPR"), which investigates complaints of misconduct against employees of ICE and, under certain circumstances, CBP.  Pineiro Decl. ¶¶ 11-12.  ICE OPR shares full access to the Joint Intake Case Management System with CBP's Office of Internal Affairs, which had already conducted a keyword search of that database, as described above, and ICE OPR's own keyword search using the terms "checkpoint" and "roving" did not locate any unique records.  Id. ¶ 8.  Nevertheless, in an effort to narrow the issues in dispute, ICE OPR conducted a further keyword search for the terms "roving," "roving patrol," "checkpoint," "checkpoint operation," "Ajo station," "Blythe station," "Brian A. Terry station," "Case Grande station," "Nogales station," "Willcox station," "Douglas station," "Sonoita station," "Wellton station," "Naco station," "Tuscon," "Yuma," "Tucson station," "Tucson sector," "Yuma station," and "Yuma sector."  Id. ¶¶ 9, 13.

Thus, as summarized above, and explained in greater detail in the attached declarations, these searches were more than adequate to discharge DHS's duty to conduct a reasonable search for responsive records.

**III.     DHS PROPERLY WITHHELD DOCUMENTS EXEMPT FROM DISCLOSURE**

FOIA represents a balance struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (quotation omitted).  Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused."  FBI v. Abramson, 456 U.S. 615, 621 (1982).  While these exemptions are to be "narrowly construed," id. at 630, courts must not fail to give them "meaningful reach and application," John Doe, 493 U.S. at 152.

An agency may establish that its withholdings were proper by submitting declarations that describe "the justifications for nondisclosure with reasonably specific

detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." <u>Berman v. CIA</u>, 501 F.3d 1136, 1140 (9th Cir. 2007) (quotation omitted). "If the affidavits contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption, the district court need look no further." <u>Lane v. Dep't of Interior</u>, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quotations and citations omitted). In evaluating an exemption claim, a court "must accord substantial weight to [the agency's] affidavits." <u>Minier v. CIA</u>, 88 F.3d 796, 800 (9th Cir. 1996). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" <u>Wolf v. CIA</u>, 473 F.3d 370, 374 (D.C. Cir. 2007).

### A. DHS properly withheld records under Exemption 2—agency personnel rules and practices

Exemption 2 permits the withholding of records that are "related solely to the internal personnel rules and practices of an agency." 552 U.S.C. § 552(b)(2). The "key word . . . that most clearly marks the provision's boundaries . . . is 'personnel.'" <u>Milner v. Dep't of Navy</u>, 562 U.S. 562, 569 (2011). That word refers to "employee relations and human resources" matters, <u>id.</u> at 581, such as "'the selection, placement, and training of employees,'" "hiring and firing, work rules and discipline, compensation and benefits," and the "'effective utilization of manpower to obtain optimum efficiency,'" <u>id.</u> at 569-70.

Here, DHS invoked Exemption 2 to withhold "information regarding the daily assignments and staffing of Border Patrol personnel, including zone, assignment, shift, time, and related comments—such as on Daily Unit Assignment Logs, Duty Assignment Sheets, Employee Work Schedule queries, and information from CBP's Overtime Scheduling System." Suzuki Decl. ¶ 47. This "information is used by personnel officials to evaluate the agency's staffing needs and its allocation of resources." <u>Id.</u> It relates "solely to the internal personnel rules and practices of the Border Patrol—namely, the placement of employees, their hours of work, and the most efficient and effective use of

the agency's manpower," id.—and is thus properly withheld under Exemption 2. See Milner, 562 U.S. at 569-70.

In addition, DHS withheld under Exemption 2 information regarding "administrative options for the processing of cases that may require disciplinary action, including management and information referrals; the officials notified when a particular personnel action is taken; procedures for contractors completing CBP personnel security investigations, including case numbers; and the electronic location where [a background check questionnaire] can be accessed." Suzuki Decl. ¶ 47. This information likewise relates "solely to the internal personnel rules and practices of CBP—namely, the selection, assignment, retention, and discipline of employees, including the use of background checks for such decisions," id.—and is properly withheld under Exemption 2. See Milner, 562 U.S. at 569-70. In the alternative, the information withheld under Exemption 2 was also properly withheld under Exemption 7(E), as described below.

**B.    DHS properly withheld records under Exemption 3—information exempted from disclosure by statute**

Exemption 3 permits the withholding of matters that are "specifically exempted from disclosure by statute . . . provided that such statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Under Exemption 3, the Court need not examine "the detailed factual contents of specific documents" in which withholdings have been taken. Morley v. CIA, 508 F.3d 1108, 1126 (D.C. Cir. 2007). Rather, "'the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'" Id. (citation omitted).

Here, DHS withheld information under Exemption 3 in two records. For the first, it invokes Federal Rule of Criminal Procedure 6(e), which protects the secrecy of grand jury proceedings. Fed. R. Civ. P. 6(e). It is well established that Rule 6(e) qualifies as a withholding statute under Exemption 3. See, e.g., Fund for Constitutional Gov't v. Nat'l

Archives & Records Serv., 656 F.2d 856, 867-68 (D.C. Cir. 1981).  Under Rule 6(e), "the scope of the secrecy is necessarily broad" and "encompasses not only the direct revelation of grand jury transcripts but also the disclosure of information which would reveal 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like.'" Id. (citation omitted).  The grand jury materials withheld here—namely, FBI records labeled "FEDERAL GRAND JURY MATERIAL" that reflect a forensic analysis of financial records—fall within Rule 6(e).  Marwaha Decl. ¶ 15; OIG Vaughn #244.

In the second document, DHS asserted Exemption 3 on behalf of the Transportation Security Administration ("TSA") to withhold information regarding selection criteria for the screening of air travelers.  Suzuki Decl. ¶ 49.  It relies on 49 U.S.C. § 114(r), which prohibits the disclosure of "information obtained or developed in carrying out security" that, if released, "would be detrimental to the security of transportation."  Id. (quoting 49 U.S.C. § 114(r)); see also 49 C.F.R. § 1520.5(b)(9)(i) (classifying security screening procedures, including selection criteria, as Sensitive Security Information).  That provision likewise qualifies as a withholding statute under Exemption 3, as it authorizes TSA to protect sensitive security information from disclosure.  See, e.g., Skurow v. DHS, 892 F. Supp. 2d 319, 331 (D.D.C. 2012) (49 U.S.C. § 114(r) qualifies for Exemption 3).  Thus, this information was properly withheld under Exemption 3.

C.     **DHS properly withheld records under Exemption 4—confidential commercial information**

Exemption 4 permits the withholding of "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  To fall within this provision, the withheld material must be "(1) commercial and financial information, (2) obtained from a person or by the government, (3) that is privileged or confidential."  GC Micro Corp. v. Def. Logistics Agency, 33 F.3d 1109, 1112 (9th Cir.1994).  "[C]ommercial or financial matter is 'confidential' for purposes of

13

the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  Id.

Here, DHS relied on Exemption 4 to withhold commercial information about American Science & Technology's ("AS&E") Z Backscatter Van ("ZBV"), a type of nonintrusive inspection technology.  Specifically, DHS withheld in full "the contents of the operator's manual, which contains information relating to the design, specifications, operation, and maintenance of the ZBV, as well as the model number, software type, and a photograph appearing on the cover page of the manual."  Suzuki Decl. ¶ 52. "Disclosure of this information would cause substantial harm to the vendor's competitive position because a competitor could use this information to improve the designs of their own products to better compete against AS&E's product line on future contracts."  Id. The information in the manual provides a detailed explanation of every aspect of AS&E's ZBV, including a comprehensive overview of its capabilities and characteristics that are unique to AS&E's ZBV."  Id.  "This information is provided only to customers when specifically required pursuant to contract."  Id.  "In addition, when the withheld information is paired with publicly available information concerning U.S. government contract awards, the withheld information would enable a competitor to determine what AS&E offers to CBP at what price."  Id.  "Disclosure of this information would also have a chilling effect on CBP's ability to obtain necessary information in the future, as vendors may reconsider setting forth innovative products in fear that the cost of doing business will be too high."  Id.  Thus, this information was properly withheld under Exemption 4. In the alternative, it was also properly withheld under Exemption 7(E), as described below.

### D. DHS properly withheld records under Exemption 5—privileged information

Exemption 5 permits the withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). This provision protects material that would "normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975). Thus, Exemption 5 incorporates the privileges that are available to an agency in civil litigation, including the attorney-client privilege, the work-product doctrine, and the deliberative process privilege. See id. at 148-50.

#### 1. Attorney-client privilege and work-product doctrine

The attorney-client privilege is designed "to encourage full and frank communication between attorneys and their clients," and thereby to promote "the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). It applies to facts divulged by a client to his attorney as well as "any opinions given by an attorney to his client based upon, and thus reflecting, those facts." Elec. Privacy Info. Ctr. v. Dep't Homeland Sec., 384 F. Supp. 2d 100, 114 (D.D.C. 2005). To invoke the privilege under Exemption 5, an agency must show that withheld material (1) involves "confidential communications between an attorney and his client" and (2) relates to "a legal matter for which the client has sought professional advice." Mead Data Cent. Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 252 (D.C. Cir. 1977).

The work-product doctrine protects materials prepared by attorneys and others in anticipation of litigation, including government attorneys engaged in litigation and pre-litigation counseling. See Fed. R. Civ. P. 26(b)(3); Sears, Roebuck & Co., 421 U.S. at 154; In re Grand Jury Subpoena, 357 F.3d 900, 907 (9th Cir. 2004). Its purpose is to "encourage effective legal representation . . . by removing counsel's fears that his thoughts," once reduced to paper, "will be invaded by his adversary." Jordan v. United States DOJ, 591 F.2d 753, 775 (D.C. Cir. 1978). The doctrine attaches to both "factual" work product, such as facts gathered during an investigation, and "opinion" work product, such as mental impressions, conclusions, legal theories, and evaluations of the

strength or weakness of a position.  See, e.g., Kintera, Inc. v. Convio, Inc., 219 F.R.D.
503, 507 (S.D. Cal. 2003); see also Pac. Fisheries Inc. v. United States, 539 F.3d 1143,
1148 (9th Cir. 2008) ("if a document is covered by the attorney work-product privilege,
the government need not segregate and disclose its factual contents").  It extends to
"'documents prepared in anticipation of foreseeable litigation, even if no specific claim is
contemplated,'" Feshback v. SEC, 5 F. Supp. 2d 774, 782 (N.D. Cal. 1997) (quoting
Schiller v. NLRB, 964 F.2d 1205, 1208 (D.C. Cir. 1992)), and properly protects materials
that "advise the agency of the types of legal challenges likely to be mounted against a
proposed program, potential defenses available to the agency, and the likely outcome,"
Delaney, Migdail & Young v. IRS, 826 F.2d 124, 127 (D.C. Cir. 1987).

Here, DHS invokes the attorney-client privilege and the work-product doctrine to
protect four categories of documents: (1) "memoranda from attorneys in CBP's Office of
Chief Counsel to [Border Patrol] employees in response to requests for legal opinions or
advice, and marked as attorney-client privileged and attorney work product," Suzuki
Decl. ¶ 56; (2) litigation hold materials, such as "litigation hold letters," Tyrrell Decl.
¶ 13, and "records retention forms," Suzuki Decl. ¶¶ 55-56; (3) "memoranda analyzing
complaints, including the legal issues raised, the potential relationship to pending
litigation, and the evidence that may be relevant for internal investigations," Tyrrell Decl.
¶ 13; and (4) "memoranda requesting evidence from other agencies for internal
investigations," id.  These documents consist of confidential communications, contain
legal analysis and advice, and were prepared in anticipation of litigation.  Suzuki Decl.
¶ 56; Tyrrell Decl. ¶ 13.  Indeed, "individuals in immigration removal proceedings and
defendants in criminal proceedings commonly litigate the propriety of their detentions,
searches, and apprehensions at checkpoints, and the parties here may end up litigating,
and have litigated, claims of alleged civil rights and other violations at Border Patrol
checkpoints."  Suzuki Decl. ¶ 56.  Thus, these records are properly withheld under
Exemption 5 as attorney-client privileged and work product.

In addition, in the records referred to EOUSA, attorney work product was withheld in two letters from an Assistant U.S. Attorney ("AUSA")—one to investigative agents spelling out, among other things, the "types of evidence expected" for a particular prosecution to be successful, and the other "assessing the evidence developed during an investigation." Kornmeier Decl. ¶ 6; EOUSA Vaughn ##1, 3. These letters contain the AUSA's legal theories and analysis, and were prepared in connection with specific litigation matters. Id. Thus, they were properly withheld under Exemption 5.

## 2. Deliberative process privilege

The deliberative process privilege protects material that reflects agency deliberations. It "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001). The privilege protects material that is both "predecisional and deliberative." Mapother v. DOJ, 3 F.3d 1533, 1537 (D.C. Cir. 1993). A document is predecisional if "it was generated before the adoption of an agency policy" and deliberative if "it reflects the give-and-take of the consultative process." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). The deliberative process privilege therefore applies broadly to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Id. at 866.

Here, DHS relies on the deliberative process privilege to withhold three categories of documents: (1) drafts and suggested edits to drafts; (2) proposals, recommendations, and similar materials reflecting the give-and-take of agency decisionmaking; and (3) suggestions that legal advice be obtained, and recommendations offered in response to those suggestions. First, DHS withheld several draft documents, including draft letters responding to complaints and draft legal memoranda, as well as emails suggesting edits

to draft documents.  Tyrrell Decl. ¶ 13.  Both draft material and the drafting process itself are inherently predecisional and deliberative, and are thus protected under Exemption 5. See, e.g., Exxon Corp. v. Dep' t of Energy, 585 F. Supp. 690, 697 (D.D.C. 1983) ("[d]raft documents, by their very nature, are typically predecisional and deliberative"); Marzen v. HHS, 825 F.2d 1148, 1155 (7th Cir. 1987) (Exemption 5 "protects not only the opinions, comments and recommendations in the draft, but also the process itself").

Second, DHS withheld proposals, recommendations, and similar materials, such as "emails discussing proposed responses to complaints," Tyrrell Decl. ¶ 13; "recommendations about suggested action in disciplinary cases," Suzuki Decl. ¶ 55; suggested "'correct answers' that interviewing agents expected to hear from interviewees" during investigations, Marwaha Decl. ¶ 17; OIG Vaughn #213; and portions of a "vulnerability assessment designed to enable Border Patrol leadership to identify areas of concern," Suzuki Decl. ¶ 55.  These materials are predecisional, as they predate the decisions made on the complaints or investigations at issue, and deliberative, as they reflect the give and take of agency deliberations.  See Tyrrell Decl. ¶ 13-15; Suzuki Decl. ¶ 55; Marwaha Decl. ¶ 17; OIG Vaughn #213.

Third, DHS withheld "material suggesting that legal advice be obtained" on certain subjects, and recommendations offered in response to such suggestions, including "memoranda from agency attorneys . . . reflecting the content of requests for legal advice," Suzuki Decl. ¶ 55, as well as records retention forms, "which reflect deliberations and internal considerations about what records to retain regarding specific complaints," id.  "Release of this material would expose the internal deliberations of the Executive branch, impede the frank and candid exchange of ideas and information within the Department and among cooperating agencies, reveal the reasoning and recommendations of Executive branch officials, and ultimately have a chilling effect on intra-agency communications."  Id.; see also Tyrrell Decl. ¶ 13-15; Marwaha Decl. ¶ 17; OIG Vaughn #213.  This material was thus appropriately withheld under Exemption 5.

## E. DHS properly withheld records under Exemptions 6 and 7(C)— personal privacy

Exemption 6 permits the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Its more expansive law-enforcement counterpart, Exemption 7(C), permits the withholding of "law enforcement records or information" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." Id. § 552(b)(7)(C). Under both provisions, the individual's right to privacy is balanced against the public's interest in disclosure, but Exemption 7(C) tilts more heavily in favor of nondisclosure. See Yonemoto, 686 F.3d at 693 n.7 (describing Exemption 7(C)'s broader protections). These provisions are often considered together. See id.

As a threshold matter, to fall within Exemption 7(C)—or any other provision of Exemption 7 discussed below—the record must have been "compiled for a law enforcement purpose," 5 U.S.C. § 552(b)(7)(C), which requires an examination of whether the agency serves a "'law enforcement function.'" Church of Scientology Int'l v. IRS, 995 F.2d 916, 919 (9th Cir. 1993) (citation omitted). Defendant plainly does. CBP—the Border Patrol's parent agency—"is a law enforcement agency with enforcement responsibilities for over 400 Federal statutes," including the "immigration laws of the United States." Suzuki Decl. ¶ 63. Given this "clear law enforcement mandate," Defendant "'need only establish a rational nexus between enforcement of a federal law and the document for which [a law enforcement] exemption is claimed.'" Rosenfeld v. U.S. Dep't of Justice, 57 F.3d 803, 808 (9th Cir. 1995); see, e.g., Gilman v. DHS, 32 F. Supp. 3d 1, 19 (D.D.C. 2014) ("CBP is indisputably a law enforcement agency and is entitled to deference in its determination that the records were compiled for a law enforcement purpose."). Because the documents responsive to Plaintiffs' requests relate to the Border Patrol's enforcement of the immigration laws through the use of checkpoints and roving patrols, this test is satisfied.

DHS invoked Exemptions 6 and 7(C) to protect the names and other identifying information of individual Border Patrol agents, other federal employees, and third parties.

Suzuki Decl. ¶¶ 59, 65; Marwaha Decl. ¶ 19; Tyrrell Decl. ¶¶ 16-17; Piniero Decl. ¶ 29.

Similarly, in the records referred to other agencies, Exemptions 6 and 7(C) were asserted to withhold the names and other identifying information of DOJ employees and other third parties, Kornmeier Decl. ¶ 6; EOUSA Vaughn ##1-3, including criminal history "rap sheets," a fingerprint submission form, a subpoena response letter containing cell phone call records, and an FBI background report consisting of intelligence provided by a confidential source, Hardy Decl. ¶¶ 13-23; FBI Vaughn ##1-6. Notably, with respect to third parties, this information is not responsive to Plaintiffs' FOIA requests in the first place. Both requests stated: "Should any responsive record contain the personal identifying information of any third party, Requesters ask that the agencies redact that information. This Request seeks aggregate stop data and records relevant to Border Patrol checkpoint operations, <u>not</u> any personal or identifying information about any specific individual." Compl. Ex A at 4; Compl. Ex. B at 5. In any event, this information was properly withheld under Exemptions 6 and 7(C), as "releasing the identities of third parties merely mentioned in agency records, without a notarized authorization, would violate their legitimate privacy interests." Suzuki Decl. ¶ 60; <u>see</u> Hardy Decl. ¶¶ 19-23.

Exemptions 6 and 7(C) were also properly asserted to withhold the names of Border Patrol agents and other federal employees, including law enforcement agents and investigators. "[I]ndividuals do not waive all privacy interests in information relating to them simply by taking an oath of public office." <u>Lahr v. Nat'l Transp. Safety Bd.</u>, 569 F.3d 964, 977 (9th Cir. 2009). In particular, it is well settled that law enforcement agents—like Border Patrol agents—have protectable privacy interests in their identities. <u>See id.</u> (FBI agents have "a legitimate interest in keeping private matters that could conceivably subject them to annoyance or harassment," such as through "unwanted contact by the media and others"). That holds true when a government employee is himself the subject of an investigation. <u>See, e.g.</u>, <u>Hunt v. FBI</u>, 972 F.2d 286, 288 (9th Cir. 1992) (a "government employee generally has a privacy interest in any file that reports on an investigation that could lead to the employee's discipline or censure").

Courts broadly construe the privacy interests protected by Exemptions 6 and 7(C). See, e.g., DOJ v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 763 (1989) ("privacy encompass[es] the individual's control of information concerning his or her person"). On the other side of the scale, the "only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." Yonemoto, 686 F.3d at 694 (citation omitted). Here, there is no public interest served by revealing the information protected by Exemptions 6 and 7(C). Identifying particular Border Patrol agents would shed no light on the Border Patrol operations—checkpoints and roving patrols—that are the focus of Plaintiffs' requests. That is even more true with respect to third parties—be they informants, individuals merely mentioned, or other law enforcement officials—as their identities have nothing whatsoever to do with Border Patrol operations. See, e.g., Council on Am.-Islamic Relations v. FBI, 749 F. Supp. 2d 1104, 1119-21 (S.D. Cal. 2010) (upholding application of Exemption 7(C) to FBI agents and support personnel, local law enforcement employees, and third parties who provided information or who were merely mentioned).

## F. DHS properly withheld records under Exemption 7(D)—confidential sources

Exemption 7(D) permits the withholding of law enforcement information that "could reasonably be expected to disclose the identity of a confidential source" and, in criminal cases, "information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). Unlike Exemptions 6 and 7(C), Exemption 7(D) requires no balancing of public and private interests. See Dow Jones & Co. v. DOJ, 917 F.2d 571, 575-76 (D.C. Cir. 1990). Rather, it applies where a source has provided information under either an express or implied promise of confidentiality. See DOJ v. Landano, 508 U.S. 165, 172 (1993). Exemption 7(D) is given "robust" application to ensure that "confidential

sources are not lost through retaliation . . . for past disclosure or . . . fear of future disclosure." Brant Constr. Co. v. EPA, 778 F.2d 1158, 1162 (7th Cir. 1985).

Here, DHS invoked Exemption 7(D) to protect the names and identification numbers of confidential sources and confidential informants ("CIs"), as well as other "specific information provided by CIs that could that could be used to identify them." Marwaha Decl. ¶ 21. For example, DHS withheld identifying information such as "the alias of an individual associated with the CI and the nature of the relationship between that individual and a target, the date of the CI's meeting with the individual, and a description of what the CI was tasked with communicating to the individual." Id. It likewise withheld "details provided by a confidential source of an alleged alien smuggling operation involving an unnamed BPA and a third party, including [an] address, cross streets, license plate numbers, recent social interactions, and meetup and border crossing locations." Suzuki Decl. ¶ 67. Similarly, in a record referred to the FBI, the name of and identifying information provided by a confidential source were withheld, including "specific and detailed information that is singular in nature pertaining to drug trafficking activities." Hardy Decl. ¶ 27.

This information is detailed and unique, and revealing the identity of—and information provided by—these sources "would have a chilling effect on the activities and cooperation of this and other future confidential sources," Suzuki Decl. ¶ 67, and could make them "target[s] for harassment and retaliation," Hardy Decl. ¶ 27. Accordingly, it was appropriately withheld under Exemption 7(D). See, e.g., Span v. DOJ, 696 F. Supp. 2d 113 (D.D.C. 2010).

### G. DHS properly withheld records under Exemption 7(E)—law enforcement techniques, procedures, and guidelines

Exemption 7(E) is composed of two distinct clauses. It permits the withholding of law enforcement information that, if released, "would disclose techniques and procedures for law enforcement investigations or prosecutions," or "would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be

expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E) (emphasis added).

Courts are divided as to whether the phrase "if such disclosure could reasonably be

expected to risk circumvention of the law" applies only to the "guidelines" clause, or also

to the "techniques and procedures" clause.  See, e.g., Asian Law Caucus v. DHS, No. 08-

00842, 2008 WL 5047839, at *3 (N.D. Cal. Nov. 24, 2008) (noting that courts "have

come out on both sides of the issue" and that the Ninth Circuit has not "squarely

addressed" it).  However, the better reasoned decisions recognize that the statute's plain

text and legislative history show that law enforcement "techniques and procedures" are

protected categorically—in other words, for techniques and procedures, a showing that

"disclosure could reasonably be expected to risk circumvention of the law" need not be

made.  See Allard K. Lowenstein Int'l Human Rights Project v. DHS, 626 F.3d 678, 681

(2d Cir. 2010) (finding that the "sentence structure of Exemption (b)(7)(E)" and "basic

rules of grammar and punctuation dictate that the qualifying phrase modifies only the . . .

'guidelines' clause," and that "[a]ny potential ambiguity in the statute's plain meaning is

removed . . . by the history of the statute's amendments"); see also, e.g., Durrani v. DOJ,

607 F. Supp. 2d 77, 91 (D.D.C. 2009) ("techniques and procedures" entitled to

categorical protection under Exemption 7(E)).

     Even if a showing that "disclosure could reasonably be expected to risk

circumvention of the law" were required to protect techniques and procedures, Defendant

would still be entitled to summary judgment.  See Asian Law Caucus, 2008 WL

5047839, at *3-5 (finding it unnecessary to resolve the issue).  That phrase "sets a

relatively low bar for the agency to justify withholding."  Blackwell v. FBI, 646 F.3d 37,

42 (D.C. Cir. 2011).  It "looks not just for circumvention of the law, but for a risk of

circumvention; not just for an actual or certain risk of circumvention, but for an expected

risk; not just for an undeniably or universally expected risk, but for a reasonably expected

risk; and not just for certitude of a reasonably expected risk, but for the chance of a

reasonably expected risk."  Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir.

2009) (emphasis added).  That forgiving standard is met here.

As explained in the attached declarations, DHS has withheld the following types of law enforcement techniques, guidelines, and procedures under Exemption 7(E):

- "techniques and procedures for performing 'records checks' in law enforcement databases, including the names of systems searched, the types of information sought, and how that information is used," Suzuki Decl. ¶ 69;

- "techniques for identifying and investigating violations of law, including known smuggling routes, meeting points for transfers of contraband, tactics used to attempt to conceal contraband or evade detection, tactics used to attempt to circumvent checkpoints," id., including "bypass" routes, OIG Vaughn #226, and "vehicle characteristics and motorist behaviors that may be indicative of illegal activity," Suzuki Decl. ¶ 69;

- "specific procedures, agent signals, and questioning techniques used during traffic stops" and interviews, id.; OIG Vaughn #213;

- "investigative techniques and guidelines regarding Border Patrol equipment and capabilities, including the type of equipment and number of personnel deployed at checkpoints, personnel shift times and assignments, and exact checkpoint locations and arrest or incident coordinates," Suzuki Decl. ¶ 69; see also id. ¶ 71 (daily assignment logs); OIG Vaughn #272 (number and types of equipment at checkpoint), ##305, 392 (checkpoint and roving patrol staffing and assignments);

- "techniques, procedures, and circumstances under which the Border Patrol partners with other agencies to share information or to conduct investigations or immigration enforcement," Suzuki Decl. ¶ 69;

- "techniques and procedures regarding radio communications, including the platforms and channels used, and logs of radio calls," id., and surveillance techniques and procedures, including locations, equipment used, and details of telephone intercepts and call pattern analyses, OIG Vaughn ##271, 293, 300-303;

- "guidelines for the type and quantum of evidence sought to apprehend or pursue charges against a suspect," Suzuki Decl. ¶ 69;

- "guidelines for the exercise of enforcement discretion not to apprehend or pursue charges against a suspect under certain circumstances," id., including in one record referred to EOUSA "the reasons that the [U.S. Attorney's Office] decided not to bring charges," Kornmeier Decl. ¶ 6; EOUSA Vaughn #3;

- "techniques, procedures, and guidelines for the use of canines, including how they are trained, what substances they are trained to detect, under what circumstances a sniff or search will be conducted, how they react to target substances, and whether and how it might be possible to circumvent them," Suzuki Decl. ¶ 69, and where and when they are deployed, OIG Vaughn #305; and

- "techniques, procedures, and guidelines for the conduct of background investigations of CBP employees, including sources of information, law enforcement databases checked, questions asked, coordination and consultation with other agencies, dissemination of investigative material, and timelines for completion." Suzuki Decl. ¶ 69.

Disclosure of this information would risk circumvention of the law. For example, "if details about Border Patrol's investigative techniques—such as its knowledge of smuggling routes or concealment tactics—became known, smugglers would change their behavior to avoid detection." Suzuki Decl. ¶ 69. Similarly, "if the specific procedures and questioning techniques used during traffic stops became known, smugglers would have a script of what to expect, and could adjust their behavior accordingly." Id. Moreover, "if information about Border Patrol capabilities—such as equipment and canine deployment, staffing levels, and apprehension rates at particular checkpoints— became known, smugglers would essentially have a road map identifying areas where they are less likely to be apprehended and checkpoints that may be more vulnerable to attack." Id. Indeed, "the Border Patrol itself uses this information to develop strategies to combat illegal activity at a local level, to determine how best to allocate its resources, and to analyze the effectiveness of its efforts." Id. Further, if details about sensitive Border Patrol information and communications—like database contents, radio channels,

25

and inter-agency partnerships—became known, smugglers would know exactly what the Border Patrol knows, and who the agency is sharing that information with, enabling them to avoid detection."  Id.

In addition, DHS withheld under Exemption (b)(7)(E) various "case numbers and other internal codes identifying memos, reports, events, incidents, subjects, property, and similar items," Suzuki Decl. ¶ 70; see also Piniero Decl. ¶ 38 (similar numbers and codes, including "Program codes, Sector Radio codes, Officer code names," "FBI numbers, Fingerprint numbers," and "Seizure numbers"), as well as "information that could be used to locate, access, and navigate internal law enforcement computer systems and databases," Suzuki Decl. ¶ 70; see also Piniero Decl. ¶ 38 (including "internal website links").  Release of this information "could enable individuals to . . . access law enforcement records without authorization," Suzuki Decl. ¶ 70, allowing them to "compromise the integrity of the data by deleting or manipulating it . . . to potentially circumvent detection," Piniero Decl. ¶ 38.  Thus, this information was properly withheld under Exemption 7(E).

### H. DHS properly withheld records under Exemption 7(F)—risk to life or physical safety

Exemption 7(F) permits the withholding of law enforcement information that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).  This exemption originally protected only "law enforcement personnel," but was later amended to protect the safety of "any individual," including "witnesses, interviewees, victims, informants, or families of law-enforcement personnel" and others.  Elec. Privacy Info. Ctr. v. DHS, 777 F.3d 518, 527 (D.C. Cir. 2015). Exemption 7(F) is more expansive than Exemption 7(C), as it provides an "absolute ban" on disclosure, Raulerson v. Ashcroft, 271 F. Supp. 2d 17, 29 (D.D.C. 2003), that "does not require any balancing test," Shores v. FBI, 185 F. Supp. 2d 77, 85 (2002).  Where there is "some nexus between disclosure and possible harm," courts generally "defer[] to

the agency's assessment of danger." <u>Levy v. USPS</u>, 567 F. Supp. 2d 162, 169 (D.D.C. 2008).

Here, DHS invoked Exemption 7(F) in three circumstances to protect the names and other identifying information of Border Patrol agents, other CBP employees, and third parties where disclosure could reasonably be expected to risk their safety or the safety of others. First, this information was withheld where "third parties explicitly state that they fear physical harm or death from smugglers, or such a fear is evident from other statements made during encounters." Suzuki Decl. ¶ 76. Second, certain "security requirements for canine handlers that cannot be more specifically described without potentially risking physical harm or death to a canine handler" were withheld. <u>Id.</u> Third, Border Patrol station organizational charts revealing the "names of all employees, the organizational structure, and shift times," as well as videos revealing similar information at a checkpoint, were withheld "because smugglers could use this information to determine station and checkpoint vulnerabilities and plan attacks," endangering agents and the public. <u>Id.</u> This information was therefore appropriately withheld under Exemption 7(F). <u>See, e.g.</u>, <u>Peter S. Herrick's Customs & Int'l Trade Newsletter v. CBP</u>, No. 04-00377, 2006 WL 1826185, at *9 (D.D.C. June 30, 2006) (disclosure of CBP officers' identities and information about seized contraband could endanger safety of both CBP officials and innocent bystanders).

Thus, as summarized above, and explained in greater detail in the attached declarations and <u>Vaughn</u> indexes, Defendant properly withheld information that was exempt from disclosure under FOIA.[1]

## IV. REASONABLY SEGREGABLE PORTIONS OF RESPONSIVE RECORDS HAVE BEEN RELEASED

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are

---

[1] DEA has not yet completed processing 5 pages of records that were referred to it. The other records referred to DEA were either further referred to EOUSA, and have been processed, or were determined to be duplicative or nonresponsive.

exempt under this subsection."  5 U.S.C. § 552(b).  Here, Plaintiffs have been provided with all segregable, nonexempt information from the documents that are responsive to the requests and subject to FOIA.  See Suzuki Decl. ¶ 78.  For example, in responding to Plaintiffs' requests, a CBP attorney "reviewed each release of records to confirm that any withholdings were proper" and, later, "performed a second review of each record to determine whether any segregable, nonexempt information could be released."  Id.  In addition, in preparing its Vaughn index, another CBP attorney "performed a line-by-line review of the records that have been released to Plaintiffs to identify information exempt from disclosure or for which a discretionary waiver of exemption could apply."  Id.  Indeed, most of the pages from the documents released to Plaintiffs contain a combination of both redacted and unredacted information.  Thus, DHS reasonably segregated the exempt portions of the responsive records.  See, e.g., Asian Law Caucus, 2008 WL 5047839 at *6 (defendant carried burden of segregating nonexempt information where redactions often consisted of single sentences, clauses, or words, and pages withheld in full contained small amounts of nonexempt material that was inextricably intertwined with exempt information).

## VI.   PLAINTIFFS' REMAINING CLAIMS ARE MOOT

Plaintiffs' remaining claims—regarding the timeliness of Defendant's response to their FOIA requests and Defendant's failure to grant them a fee waiver or limitation, Compl. ¶¶ 35-36—are moot, given that Defendant has completed its response to the requests and does not intend to charge Plaintiffs fees for the records produced.  See Atkins v. DOJ, No. 90-5095, 1991 WL 185084, at *1 (D.C. Cir. Sept. 18, 1991) ("The question whether [the agency] complied with [FOIA's] time limitation in responding to [plaintiff's] request is moot because [the agency] has now responded to this request."); Yonemoto, 686 F.3d at 689 (the "production of all nonexempt material, 'however belatedly, moots FOIA claims'"); Hall v. CIA, 437 F.3d 94, 99 (D.C. Cir. 2006) (the agency's "decision to release documents to [the plaintiff] without seeking payment from

him moots [plaintiff's] arguments that the . . . denial of a fee waiver was substantively incorrect").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be granted and judgment should be entered in favor of Defendant on all causes of action alleged in the complaint.

DATED this 13th day of May, 2016.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney
General

ELIZABETH J. SHAPIRO
Deputy Director

 /s/ Eric Beckenhauer
ERIC B. BECKENHAUER
Cal. Bar No. 237526
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Tel: (202) 514-3338
Fax: (202) 616-8470
Email: eric.beckenhauer@usdoj.gov

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Daniel Joseph Pochoda, dpochoda@acluaz.org

James Duff Lyall, jlyall@acluaz.org

I hereby certify that on May 13, 2016, I served the attached document by U.S. mail on the following, who are not registered participants of the CM/ECF System:

Derek E Bambauer

Jane Yakowitz Bambauer

479 E. Historic Street

Tucson, AZ 85701

/s/ *Eric Beckenhauer*
ERIC B. BECKENHAUER